JEREMY L. FRIEDMAN, CA Bar No. 142659
ATTORNEY AT LAW
2801 Sylhowe Road
Oakland, CA 94602
Telephone: (510) 530-9060
Facsimile: (510) 530-9087
Email: jlfried@comcast.net

Attorneys for plaintiff Evan Blickenstaff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Evan Blickenstaff | Case No. 3:21-cv-09952-WHO |
| Plaintiff, | **SECOND AMENDED COMPLAINT** (Deprivation of Constitutional Rights under 42 U.S.C. §1983 and Conversion under the California Tort Claims Act, Govt. Code §845.6) |
| vs. | |
| City of Hayward, Jack James Tow Service Inc., and the following persons in their individual and official capacities: Hayward Police Officers Daniel Morgan, Alicia Romero, Roberto Gonzalez, Sergeant Tommie Clayton, Lieutenant Ryan Cantrell, Lieutenant Wagner, and DOES ONE through TWENTY | [Jury Demand] |
| Defendants. | |

## INTRODUCTION

1. This is an action by plaintiff Evan Blickenstaff against the City of Hayward, Jack James Tow Service, Inc., and various police officials, arising out of a joint action and intentional plan to wrongfully seize, tow, convert and permanently deprive him of use of his motor home under color of law, without probable cause or reasonable grounds, as an excessive fine or punishment, as a taking for public use without compensation, and without due process, in violation of his constitutional rights and the tort of conversion.

## JURISDICTION

2. Subject matter jurisdiction is predicated on federal question jurisdiction (28 U.S.C. §1331) due to claims under 42 U.S.C. §1983, with supplemental jurisdiction (28 U.S.C. §1367) over state law claims.

# PARTIES

3. Plaintiff Evan Blickenstaff is an individual who resides in this district. At all times relevant herein, plaintiff was the owner of a 1989 Travelcraft Econoline 350 Motorhome, which is where he was living, as well as personal property that he maintained along with his motorhome and storage containers.

4. The City of Hayward is a public entity and local government within this District. At all times relevant to this litigation, the City of Hayward operated the Hayward Police Department, and was responsible for the implementation of police policies, practices and customs with respect to the seizure of personal property and towing of vehicles belonging to persons in its jurisdiction.

5. Jack James Tow Service, Inc., is a corporation engaged in the business of providing towing services, with offices in Hayward and Fremont. Jack James Tow Service performs its services pursuant to licenses and permits provided by the United States Department of Transportation and the California Department of Motor Vehicle as a motor carrier. At all times relevant to this litigation, Jack James performs work and takes actions under color of law pursuant to agreements with the police departments of Hayward and Fremont.

6. Defendant Hayward Police Officers known to have been involved and responsible for the actions described herein include: Officer Daniel Morgan, Vehicle Abatement Officer Alicia Romero, Officer Roberto Gonzalez, District Command Sergeant Tommie Clayton, Lieutenant Ryan Cantrell, and Lieutenant Wagner. All named officer defendants are sued in their individual and official capacities.

7. Plaintiff is ignorant of the true names of defendants sued as Does ONE through TWENTY, inclusive, or knows their names (and may identify them herein) but has yet to learn their true capacities and involvement in the underlying claims. He therefore sues these defendants by such fictitious names. Plaintiff will amend the complaint to allege the true names, capacities and actions when ascertained. Plaintiff is informed and believes and thereupon alleges that each fictitiously named defendant is an officer, employee, agents, contractor, official and/or representative of the named City or Tow Service, and is

responsible in some manner for the occurrences alleged herein; and plaintiff's injuries as herein alleged were proximately caused by these defendant Does' acts.

8. Plaintiff is informed and believes and thereon alleges, that each defendant herein was, at all times relevant to this action, the agent, employee, official, contractor, officer or joint venturer of the remaining defendants and was acting within the course and scope of that relationship. Plaintiff is further informed and believes and thereon alleges, that each defendant herein gave consent to, ratified, and authorized the acts alleged herein to each of the remaining defendants.

**GENERAL ALLEGATIONS**

9. For at least two years prior to the incident giving rise to this action, plaintiff Evan Blickenstaff was a resident in the City of Hayward. Although he is highly intelligent, well organized and articulate, plaintiff suffers from disabilities effecting his memory and cognitive abilities, stemming from a car accident and traumatic head injury in approximately 1994. For the period of time that plaintiff resided in Hayward, he also suffered from a physical disability (hernia) which interfered with his ability to move heavy objects. Since approximately 2004, plaintiff had taken up a transient residence and avoid having to pay rent for a room or apartment. He was able to do so by creating a home in recreational vehicles, which he bought and from time to time replaced, leading up to the Travelcraft Motorhome he owned at the time of the incidents described herein.

10. Prior to the incidents giving rise to this action, plaintiff had earlier interactions with Hayward Police regarding his living out of his motorhome. These interactions occurred in or about October and November of 2019, on Julia Street near Baumberg Avenue in Hayward. At this location, there are several commercial enterprises and commercial lots where large vehicles frequently park in driveways and use public property as they repair and fabricate vehicles, repair and replace tires, and load and offload pallets into storage. Plaintiff was living in his motorhome on Julia Street parked on private property with the owner's permission. This permission was renewed when a new owner purchased the property, and plaintiff agreed to provide additional security

1    respecting the property. Plaintiff had permission to store personal property and equipment

2    on the private property. For one period of time, plaintiff had an agreement with the

3    property owner that he would park his motorhome to block from public access a missing

4    section of fence line – freeing up the owner's commercial truck that was otherwise parked

5    there for this purpose.

6        11. During a period of time in approximately October 2019, plaintiff and the property

7    owner on Julia Street entered into a dispute regarding their relationship, involving the

8    owner's actions towards various items of plaintiff's property. During this time period,

9    Hayward Police intervened, and one occasion convinced the property owner to return

10   personal property that had belonged to plaintiff. As a result of the dispute, however, the

11   property owner changed his mind and determined to breach the agreement with plaintiff

12   and withdraw permission to be on the property without notice. On one occasion in

13   October or November of 2019, plaintiff was approached by several Hayward Police

14   Officers, including defendants Morgan, Romero and Clayton. These officers sought to

15   have plaintiff and his motorhome removed immediately for trespass and for using public

16   property. These grounds were without a basis, however, since plaintiff had permission to

17   enter onto the land, and was not on public property except for transition into storage units.

18   After an exchange of communications, including a letter sent on plaintiff's behalf by an

19   attorney, plaintiff and the property owner reached an agreement, where by plaintiff agreed

20   pack up his property and find another location within two weeks.

21       12. As a result of these interactions on Julia Street, the Hayward Police Department

22   knew Evan Blickenstaff, knew that he had been a Hayward resident, and knew that he

23   owned and lived in an operable motorhome. In addition, as a result of these interactions,

24   and their failure to remove plaintiff immediately in 2019, Hayward Police Officers,

25   including defendants Morgan, Romero and Clayton, after consultation with their superiors

26   (above District Command Sergeant Clayton), formed an animus against plaintiff, as they

27   hatched an intentional plan to remove plaintiff from the city and/or destroy his ability to

28   live in his motorhome within the city's limits (1) without probable cause or reasonable

grounds, (2) as an excessive fine or punishment for challenging them on their declaration of trespass, (3) as a taking without compensation in order to finance the city's towing program, and (4) without proper notice or an opportunity to be heard. As part of this plan, defendants determined to forcibly and summarily seize plaintiff's motorhome without a reasonable basis to believe the vehicle to be abandoned or inoperable, to convert the vehicle after a tow pursuant to a contract with defendant Jack James Towing Service (Jack James), and to deprive plaintiff of the peace and security of his motorhome – where he resided.

**HAYWARD'S CONTRACTS, ORDINANCES, POLICIES AND CUSTOMS**

13. Defendants were able to hatch and execute this described plan pursuant to Hayward's ordinances, policies, customs and practice regarding removal of "abandoned" vehicles. First, Hayward and Jack James have entered into a long-standing contract whereby the tow service will seize and remove any vehicle at the direction of the police, regardless of the wishes or objections of the vehicle's owners. Pursuant to the contracts and continuing practices of the City and the tow service, a lien will automatically attach as a result of Jack James' removal of such vehicles, and Jack James will either force their public sale to obtain payment of tow and storage fees, or it will bypass required public sale procedures to convert the vehicles and refuse their return to the rightful owners. For example, Jack James in conjunction with Hayward Police will on occasion create a "junk slip" for vehicles that have been seized and towed pursuant to this agreement. Although such ownership papers are only appropriate for wrecked or inoperable vehicles, Hayward and Jack James have developed a contract, policy, custom and practice to create and use "junk slips" on operable vehicles to avoid any obligation to return such vehicles to their proper owners. In addition, Jack James, under the auspices and supervision of the Hayward Police, will engage in tactics to wrongfully convert seized vehicles, including failure to provide notice of lien auctions, publication of incorrect sale information, and the failure to conduct auctions pursuant to such notices, as well as other departures from rules and procedures for public auctions.

14. Hayward enters into its contract with Jack James as alleged herein and permits the towing contractor to remove and convert vehicles in order to finance its towing program. On information and belief, the city's arrangement with Jack James affords the city with a towing service, whereby the contractor will tow and remove vehicles at the city's direction, with zero or near zero costs paid by the city. Over the course of the long-term contractual relationship, the city has learned of, approved, ratified and encouraged the towing service to scrap vehicles or conduct lien sales and keep all money recovered, without reimbursement of proceeds to the owner. The city considers the lost value of the seized vehicles to be a punishment or fine imposed upon the owner of the vehicle for real or perceived transgressions, and it considers the revenue received by the towing contractor to be a financing of the city's towing program.

15. Second, Hayward has written ordinances, policies, customs and practices for the removal of  abandoned vehicles that allow Hayward police officers to wrongfully and summarily seize and convert vehicles through the City Council's authority over public nuisances without probable cause, as an excessive fine or punishment, to finance or subsidize its towing program, and without notice or an opportunity for a meaningful hearing. Through its Abandoned Vehicle Abatement provisions, Hayward Ord. §§ 4-1.20 to 4-1.40, Hayward authorized the Chief of Police, including any officials in the Police Department duly appointed by the Police Chief or City Manager, to act on behalf of the Hayward City Council as "Enforcement Officer" to abate abandoned, wrecked, dismantled or inoperable vehicles. Section 4-1.33 authorizes the Enforcement Officer to cause an abatement and removal under these policies "upon discovering the existence of an abandoned, wrecked, dismantled or inoperable vehicle." Section 4-1.34 requires a 10 day notice of intention to abate and remove by registered or certified mail to the owner of the vehicle, in a form approved by the City Council. Section 4-1.35 requires a public hearing if requested by vehicle owner within 10 days of the mailing of the notice, and § 4-1.36 describes the authority of the Enforcement Officer to hear facts and evidence, and to set conditions, as it deems appropriate. Section 4-1.37 provides for an appeal and hearing

1   by the Hayward City Council upon five days after decision of the Enforcement Officer.

2   Section 4-1.38 provides for disposal of the vehicles – by removal to a scrap yard or

3   automobile dismantler's yard, where it shall not thereafter be reconstructed or made

4   operable – within 5 days after the order declaring the vehicle to be a public nuisance, 5

5   days from the mailing of a notice of decision by the Enforcement Officer after hearing

6   pursuant to § 4-1.36, or 15 days after action by the governing body authorizing removal

7   following appeal.

8       16. Embedded within the city's vehicle abatement is an acknowledgment by the city

9   and its police officers that abatement proceedings must be based on reasonable grounds

10  for believing that vehicles subject to the abatement program are abandoned, wrecked,

11  dismantled or inoperable, and that such determinations are made after reasonable inquiry

12  and investigation, including communication with the owner of the vehicle, and notice of

13  dates for inspection and reinspection to determine such status before any abatement order

14  is issued pursuant to the ordinance, policy, procedures and customs.

15      17. These ordinances, and the policies and practices taken pursuant to these

16  ordinances, enable Hayward Police Officers to take arbitrary, capricious and excessive

17  vehicle abatement actions on behalf of the City Council because, among other

18  deficiencies, they:

19      (1)    Fail to specify procedures by which vehicle owners are informed of dates for

20                inspection and reinspection of vehicles, by which vehicle owners are given an

21                opportunity to declare an intent of non-abandonment or demonstrate

22                operability, and by which participating officers are precluded from terminating

23                the inspection process for their own arbitrary and capricious purposes;

24      (2)    Fail to provide objective standards or any statement of factors to consider to

25                determine when a vehicle has been "abandoned" or is "inoperable";

26      (3)    Fail to restrict vehicle abatement orders to the scope permitted by Vehicle Code

27                § 22669, which authorizes a police officer removal order only when that officer

28                "has reasonable grounds to believe that the vehicle has been abandoned";

(4)    Fail to limit the abatement authority of the Enforcement Officer, or authority of other Hayward Police Officers acting pursuant to an abatement order, as required by the Fourth Amendment to the United States Constitution, and as imposed by the California legislature in 2018, through the amended Vehicle Code § 22650(b) (effective January 1, 2019), (stating: "Any removal of a vehicle is a seizure under the Fourth Amendment of the Constitution of the United States and Section 13 of Article I of the California Constitution, and shall be reasonable and subject to the limits set forth in Fourth Amendment jurisprudence");

(5)    Fail to limit abatement authority under the community caretaking doctrine as required by Vehicle Code § 22650(b) (allowing abatement only "if the removal is necessary to achieve the community caretaking need, such as ensuring the safe flow of traffic or protecting property from theft or vandalism"), including the limitations which clearly-established law imposes on application of the doctrine to the seizure and deprivation of a person's home;

(6)    Fail to provide appropriate provisions for abatement orders and hearing procedures as required by § 22852, where "the storing agency shall have the burden of establishing the authority for, and the validity of, the removal;"

(7)    Fail to specify the rights of vehicle owners as required by § 22851.3(f) to have storage costs waived when "reasonable grounds to believe that the vehicle was abandoned are not established";

(8)    Fail to ensure effective notice and a right to be heard to persons who are living in their vehicles or for other reasons are not found at the address to which notice is sent by registered or certified mail;

(9)    Require the vehicle owner to request a hearing within 10 days of the *mailing* of a written notice, rather than 10 days after *receipt* of such notice as confirmed by return of registered or certified notice of service, and thus fail to provide reasonable notice and meaningful opportunity to be heard when receipt of the

notice by the vehicle owner is delayed or where the notice is not delivered;

(10)   Fail to afford vehicle owners with a fair, reasonable and transparent process for persons to participate in post-seizure hearings or process for return of vehicles after they have been wrongfully removed;

(11)   Fail to prohibit Hayward Police Officers from using vehicle abatement proceedings, established solely to abate public nuisances, as a procedure for the imposition of fines and penalties on persons who are perceived as committing minor transgressions, such as parking violations, trespass or questioning of the basis for a police officer's declaration of trespass;

(12)   Fail to prohibit Hayward Police Officers from using vehicle abatement proceedings as a mechanism to impose excessive fines and penalties for other minor infractions; and

(13)   Fail to prohibit Hayward Police Officers from using vehicle abatement proceedings as a mechanism to finance and subsidize its towing program costs through the towing contractors' sale, scrap, or conversion of the vehicle without compensation paid to the owner.

18. Because of these flaws are reflected in written ordinance, policies, customs and practices, the city's police department fails to train its officers on proper law and procedure for seizing vehicles, particularly vehicles owned by displaced persons who rely upon their vehicles to provide a safe and peaceful home. Officers are not instructed or supervised on when a vehicle can be shown to be operable, indicia of when a vehicle can be determined to be "abandoned," or what notice is required to owners who live in their vehicles before they can found to be living in an "abandoned" or "inoperable" motorhome; and that they lack authority or discretion to terminate the inspection and re-inspection of vehicles that are required for a valid abatement order to issue. Further, the police department's written policies result in a process for seizing and disposing of vehicles without due consideration to the rights of the owners; and to do so in order to finance or subsidize the city's towing program.

19. Third, the Hayward Police Department has a policy, practice and custom of supporting and enforcing any plan by the Abandoned Vehicle Abatement officers to remove any vehicle they desire to have removed through the contract and city procedures. In particular, Hayward officers act in a coordinated fashion to make sure (1) that any vehicle may be tagged as abandoned or inoperable, even when members of the police know it is neither; (2) that any such vehicle can be seized or towed without probable cause or reasonable basis, without notice and meaningful opportunity to participate in any pre- or post-siezure hearings on the removal, for reasons of penalizing or fining vehicle owners excessively for trespass or for contesting an officer's declaration of trespass; and (3) that they are permanently separated from their owner without any fair, reasonable or meaningful mechanism for the vehicle's return. A coordinated effort by potentially any and all officers in the police department is required, in that any one officer could and should call out fellow officers who participate in an unlawful plan to seize and convert a resident's motorhome. Similarly, because any action taken by police officers may be subject to review by the department's structured hierarchy, Sergeants, Lieutenants, Watch Commanders, Chiefs and other higher rank officials are made aware of and allow such plans – and sometimes directly participate in them – constituting their approval and ratification of the decisions, orders, abatements and lack of procedures.

20. On information and belief, Hayward Police officers had an ongoing custom, practice and policy of using the vehicle abatement process to separate individuals from their vehicles and convert or destroy said vehicles when they suspect that the individual is using the vehicle as a living space or is otherwise utilizing vehicular homes within City boundaries, even though the officers know that the vehicles are neither abandoned or inoperable. Such information includes knowledge that the Hayward Police Department has removed a vehicle other than plaintiff's motorhome as a public nuisance even though it was not abandoned or inoperable. Moreover, such information includes knowledge of the manner in which the police officers and the Hayward City Attorney interacted with plaintiff over removal of his vehicle, and the removal of other vehicles at approximately

1  the same time, as described herein. Based upon the continuing acts taken by the Hayward

2  Police Officers pursuant to the City's ordinances, policies, practices and customs,

3  including acts taken by the Enforcement Officer designated to act on behalf of the City,

4  the governing body of Hayward had actual knowledge of the customs, practices and

5  policies of the Hayward Police officers as described herein, and/or acted with reckless

6  disregard of the customs, practices and policies leading to constitutional violations of its

7  residents.

8              **CONDITION AND CIRCUMSTANCES OF THE MOTORHOME**

9      21. On and before September 2020, Plaintiff lived inside his motor home where it was

10  parked and located, near Arden Road off of Bridge Road. At that time, Bridge street was

11  a private road in Hayward, and it was not considered public land or a public highway. The

12  private road consisted of two full lanes in both directions, with a lane for parked vehicles

13  on either side of the road, and full lanes for traffic in both directions unencumbered by

14  vehicles in the parking lane.

15     22. The motorhome was extremely valuable to Blickenstaff, with value substantially

16  in excess of $500. When plaintiff first purchased the motor home, he found its seller by

17  searching for a motorhome on Craig's List, where the motor home he purchased was

18  listed at a value of between $3,000 and $4,000. Records of comparable sales prices for

19  similar motor homes range from $4,000 to $6,000. The motor home which plaintiff lived

20  in was of particular value to him, in light of many factors, including its design and layout

21  of the interior. To purchase the motor home, plaintiff traveled a significant distance (to

22  the mountains near San Diego) to meet with the seller and complete the transaction.

23     23. While plaintiff lived in the motor home, the vehicle was in good condition. It was

24  not partially dismantled or openly lacking in any necessary parts. It did not have any signs

25  of damage beyond normal, lived-in motor homes. The only component that was openly

26  missing was a ladder extension to the roof, which did not interfere with the vehicle's

27  operation or value (but it make the motor home readily identifiable). After purchasing the

28  motor home, plaintiff made substantive improvements to it, including the replacement of

chairs with a desk, the installation of a bullet-proof panel behind the bed, and the purchase of a portable solar panel for the supply of energy. At all times relevant herein, placement and movement of the solar panels around the motor home demonstrated that he was using it and living in it.

24. In addition, the motor home was extremely valuable to plaintiff, in that it was much more than a vehicle: it was a place where plaintiff could live in peace and comfort. By living in the motor home, plaintiff had saved substantial amounts of money that otherwise would have been required for a home's rent. After plaintiff was deprived of his motor home, plaintiff was required to live out of a truck for approximately a year. The value of the lost motor home during that time was far in excess of what plaintiff would have paid in rent.

25. During the time that plaintiff lived in his motor home on Bridge, a variety of homes, businesses and vehicles could be found along the private road. Plaintiff was friendly with the people who lived or worked there, and would see, talk to and know the names of these other people on a regular basis. While plaintiff lived in his motor home on Bridge, his vehicle was parked in the parking lane, without interference with other vehicles or drivers who used that private road. On one occasion during the initial time of his living on Bridge, he had parked too close to the access point on Arden Road, and was asked to move to allow a tractor trailer to pass through. Plaintiff readily moved his vehicle further from the access point, and never posed an obstacle to traffic. At no point did anyone ever complain to him about him living in his motorhome, about any impediments to access to the public road or about the possibility of theft or vandalism.

26. There were other vehicles parked along the private road, including some that were dismantled or partially dismantled. The differences between plaintiff's motor home and these dismantled or partially dismantled vehicles were obvious, and any reasonable person would have recognized that difference. Any investigation over time or discussion with persons who lived or worked along the road would have shown that plaintiff lived in the motor home and presented no risk to the safety and well being of others.

27. During the time that plaintiff lived in his motor home on the private road, there was never any posting of signs indicating that persons found on the private road were trespassing on private property. Where plaintiff's motor home was parked, there was no other home structures or fencing in the immediate vicinity, and plaintiff's motor home never blocked any access to a property owner's driveway or home. Similarly, no owner of any private property along the road ever spoke directly or indirectly to plaintiff about where his motor home was parked, or asked him to move his vehicle.

28. In September 2020, plaintiff had reason to believe the following: No owner of private land along Bridge ever complained to the city regarding plaintiff's parking of his motor home or living on that private road. No such land owner ever petitioned the City to regulate the private road under Vehicle Code §§ 21107 *et seq.*, or to otherwise assert community caretaking powers over the road. The City of Hayward and its governing board never held a hearing, passed an ordinance or otherwise determined through public proceedings under these code sections that it had jurisdiction or authority over the area to assert or enforce parking proscriptions.

29. During the time that plaintiff lived in his motor home on Bridge, he did not see signs of vandalism or theft. There was not a spot of graffiti on the motorhome. Because he was living in the motor home and he was generally either inside or nearby, there was no non-speculative risk of vandalism or theft in connection with his motor home.

30. In or just before September 2020, while parked on Bridge and living out of his motor home, plaintiff had an occasion to see and talk to a city of Hayward employee, who appeared to be involved in code enforcement, in that he was surveying the area, looking at license numbers and vehicle identification numbers, and taking notes of vehicles and partially dismantled vehicles found in that location. On this occasion, while plaintiff was cleaning the battery terminal for his vehicle, the employee approached and engaged in conversation. At that moment, it was clear – or readily could have been made clear – that plaintiff was living in the motor home, that plaintiff owned and registered the vehicle, and that the vehicle was not dismantled or in need of any functional repair.

**WRONGFUL SEIZURE AND TOW**

31. In or about the end of September 2020, defendant Romero received an email containing photographs of plaintiff's motorhome parked on Bridge Road. Plaintiff's vehicle was one of some 15 other vehicles parked along the private road. Those photographs would have clearly distinguished plaintiff's motor home from other vehicles that were dismantled or partially dismantled. At that time, Romero knew that there were no signs or public notice that parking was prohibited along that private road, that no one had made any complaint about the presence of plaintiff's motor home, that the City Council had not passed an ordinance or otherwise extended authority over the private road, or that any abatement order had been issued with respect to plaintiff's motor home. Romero recognized plaintiff's motorhome as the one she saw at Julia Street in October 2019. Pursuant to the plan described above, Romero and her fellow Hayward Police Officers set out on a number of steps – in the midst of the Covid-19 pandemic – to permanently separate plaintiff from his vehicle/residence.

32. On or about September 28, 2020, Romero determined to use the City's abandoned vehicle abatement ordinances, policies, customs and practices to wrongfully seize the motorhome without reasonable grounds or probable cause to believe the motorhome was abandoned or inoperable, without any grounds to believe that the vehicle posed an actual risk to safety of other drivers, the flow of traffic or the prospect of vandalism, and without any pre-seizure or post-seizure notice or meaningful opportunity to contest the removal. Romero also considered an abatement of plaintiff's motor home to be a fit punishment for plaintiff's questioning of the police statements regarding trespass, and to serve as a means for the towing service to be paid for work performed on behalf of the city, without compensation to plaintiff. Romero and her fellow officers knew that the motor home was parked on a private road, it was neither abandoned nor inoperable, as was obvious from its appearance, and as was known to them as a result of their prior interactions. Romero nevertheless determined to remove the vehicle without making any direct contact with plaintiff, including during any inspection or reinspection of the vehicle.

33. Romero determined that Blickenstaff would not receive any notice of the abatement process or the right to a hearing prior to the seizure, and that she and the other officers would purposefully avoid speaking to plaintiff about the vehicle, if possible, prior to its seizure. Romero wrote in a report that she sent a "notice to abate and vehicle abatement report" to plaintiff's prior address, but she knew that Blickenstaff would not receive the notice, and/or she acted with deliberate indifference to whether Blickenstaff would actually receive it. Romero failed to send the notice by registered or certified mail, as stated in the Hayward ordinance, and/or she deliberately ignored the fact that she did not receive any confirmation of receipt of the mailed notice. This failure directly led to a knowing false assertion that plaintiff would receive notice. Had she sent a notice and done so by return service, she would have known and a record would have been created demonstrating the lack of notice regarding vehicle abatement under the city's program.

34. On or about September 29, 2020, defendants Romero, Clayton and Gonzalez met to discuss the plan on separating plaintiff from his vehicle, including going to the location of plaintiff's motor home on Bridge Road. At the location, these defendants avoided speaking directly with plaintiff regarding his motorhome, but they conducted a site review of Bridge Road containing approximately 15 other vehicles. During the site review, because Blickenstaff would be able to demonstrate that the motorhome was neither abandoned nor inoperable, these defendants made sure that Blickenstaff would not be able to participate in the initial inspection of the vehicle.

35. At some point between and including September 29, 2020 and October 10, 2020, defendant police officers placed a yellow sticker on plaintiff's motorhome. A copy of a blank yellow sticker similar to the one that was attached to the motor home is provided as Exhibit A. The yellow sticker did not state that Blickenstaff was required to move the vehicle. Because the officers did not want to interact with plaintiff before seizing the motor home, the yellow sticker did not inform Blickenstaff of the date when the officers would perform the necessary reinspection of the vehicle. The yellow sticker did not inform Blickenstaff of any right to contest any abatement determination or request a

hearing on the vehicle's removal. The only parking violations referenced in the yellow sticker were Hayward Ord. § 4-1.20 and Vehicle Code § 22660 concerning abandoned or inoperable vehicles; the yellow sticker did not provide notice of any other parking violations or infractions, including trespass. The yellow sticker informed Blickenstaff that he could comply with the abatement law by restoring the vehicle to normal operating service and demonstrating it to be operable. Defendants knew that, upon seeing the yellow sticker placed on the motorhome, Blickenstaff would believe that he could avoid removal by stating the vehicle had not been abandoned and showing the Hayward Police Officers that the motorhome was operable. The yellow sticker did not state a time frame in which Hayward would tow the vehicle, or a time for when the vehicle owner could show that it was operable, and the officers knew that Blickenstaff would reasonably believe he would have that opportunity when he spoke to the officers. The yellow sticker stated that an abatement notice would follow by mail, even though Blickenstaff never received such mailed notice, and the officers knew that would be the case because no notice was sent by registered or return mail.

36. During the relevant time period, defendant police officers knew the motor home was not abandoned, wrecked, dismantled or inoperable. In fact, defendants knew that Blickenstaff resided in the motor home, it was parked on a private road, and that it had been moved to that location by him. They also knew that plaintiff had removed the yellow sticker from the window and placed solar panels around it, indicating that he was there and using the vehicle as his home. There was no objective basis for any police officer to believe the motor home had been abandoned, wrecked or dismantled. These defendants also knew that plaintiff would not receive any mailed notice and that the yellow sticker was the only communication he would receive from the Hayward Police Department regarding his vehicle. These defendants also knew that, if given a chance on reinspection, plaintiff would declare his intent not to abandon the motor home and that he would demonstrate it was in normal operating condition.

1    37. During the relevant time period, defendant police officers determined to force

2    plaintiff to move from the location by declaring him to be in trespass, even though

3    plaintiff had not been cited, accused, notified or found to have been in trespass. The

4    police officers knew that no property owner had requested that plaintiff be removed from

5    the private road. The police officers knew that the city had not passed any ordinance or

6    taken any steps pursuant to § 21107.7 to assert jurisdiction over the private road, and that

7    no signs warning of trespass had been posted. The police officers also knew, as alleged

8    herein, that the motor home posed no impediment to traffic and presented no risk of theft

9    or vandalism. At all times, defendants knew that there was no basis in the community

10    caretaking doctrine to seize the motor home. The officers also knew that motorhome was

11    extremely valuable to Blickenstaff, and it was obvious to the police officers and the

12    Police Department that the vehicle was valued substantially in excess of $500. The

13    department and police officers also knew that Blickenstaff had not received any notice of

14    any trespass violation and had not been informed of any obligation to move the vehicle.

15    38. On or about October 6, 2020, defendant Hayward police officers, including at least

16    Officer Romero, returned the location of Bridge Road and saw that plaintiff's motor

17    vehicle was parked there. As alleged herein, Officer Romero made no attempt to

18    communicate with plaintiff about his motorhome, to include Blickenstaff in any

19    inspection or reinspection of the vehicle, or to receive any information regarding its

20    operation. This is so, even though it was obvious that plaintiff was still living in the motor

21    home and that he was maintaining it in working order. One these occasions, the police

22    officers purposefully avoided communicating with plaintiff because they did not want to

23    give him notice of the intent to tow or the assertion of trespass, as he would be able to

24    demonstrate operability and engage in a discussion with them about the lack of a legal

25    basis for any trespass assertion.

26    39. On or about October 21, 2020, defendants Romero, Morgan, Clayton and

27    Gonzalez met to carry out the plan to remove plaintiff from his motorhome, by

28    conducting a reinspection of the vehicle without warning and execute the tow on the spot.

As admitted in the police reports, defendants specifically involved Watch Commander Sergeant Clayton in a supervisory capacity specifically because of the prior interaction with plaintiff on Julia Street, where plaintiff prevented his immediate removal despite the officer's demand. Although defendants Morgan and Romero alleged that they contacted a property owner to ask whether the owner had expressly granted permission for plaintiff to be there, they knew that plaintiff had not been asked to leave. They also knew that there were no signs posting regarding trespass, not fenced in areas around where plaintiff was parked, and thus no basis in the law to charge plaintiff with criminal trespass or effectuate an immediate removal as a trespass. Defendants also knew that, if given a chance upon reinspection, plaintiff would be able to demonstrate operability, and that they would have no legitimate basis or reasonable grounds to request an abatement order under the city's ordinance, policies or customs.

40. On or about October 21, 2020, said defendants coordinated with Jack James, and along with the towing service went to the Bridge Street location to conduct the required reinspection of plaintiff's home and, one way or the other, to force plaintiff's vehicle to be removed from Hayward. This was the police officers' only direct interactions with plaintiff regarding the seizure. Said defendants knew that, in order to abate the vehicle under the city's policies and procedures, they needed to document a reinspection of the vehicle, but that if plaintiff was present, he would be able to demonstrate operability, and the basis for the proposed abatement would be nullified.

41. Plaintiff was present on the scene when the police and Jack James arrived. At the time of the reinspection, plaintiff and the police officers reasonably understood that, pursuant to the yellow sticker, plaintiff had the right and ability to avoid the tow by demonstrating that the motorhome was operable. Defendant police officers knew that this was plaintiff's reasonable understanding, and they shared in it. The officers did not indicate any belief that the motor home had been abandoned, that the vehicle posed a problem for the flow of traffic or that the vehicle was a risk for theft or vandalism. Instead, because plaintiff was present and was able to show operability, defendants

instead falsely accused plaintiff of trespassing on private property. Plaintiff then attempted to rebut the accusation and engage the police officers in a discussion of whether he was trespassing. Pursuant to the joint plan, because plaintiff attempted to engage in this discussion, the officer defendants unreasonably and wrongfully accused plaintiff of not "cooperating," and they knowingly falsely accused plaintiff of failing to comply with the reinspection, and failing to show operability.

42. Immediately after plaintiff took issue with the allegation of trespass, the police officers determined to summarily end the discussion and order the seizure and tow of the vehicle, without giving plaintiff any warning that he would lose his motor home if he did not move the vehicle. Had the police officers stated that the discussion was over and that he needed to move the vehicle to another location, plaintiff would have done so on his own accord. Plaintiff stated unequivocally that, in fact, the vehicle was operable, and he said that he was prepared to demonstrate that fact. Plaintiff also confirmed what the officers knew: that he had not received any mailed notice, and he asked for such a copy. But the police officers had already determined to tow the vehicle, regardless of whether or not it was operable, and without giving plaintiff a chance to move to another location. They made that determination to punish plaintiff for parking in a place the police wanted to declare was in trespass, to penalize plaintiff for wanting to engage in a discussion over the legal sufficiency of the trespass accusation, and to allow Jack James to seize and convert the motor home as a financing or subsidy of the city's towing program.

43. It was only after plaintiff's vehicle was taken from him that the city posted a sign regarding trespass in the area. *See* Exhibit B. The notice expressly stated that the property would be checked on October 26, 2020, when any property found on the premises would be removed. But pursuant to defendants' plan and the city's policies, ordinances, customs and practices, plaintiff's motor home was seized and converted without warning on October 21, without any justification under the abatement or trespass laws.

44. During the interaction on October 21, 2020, plaintiff requested the intervention of another supervisory officer who could attempt to address the issues regarding his

removal. Sergeant Clayton then contacted Watch Commander Nishimoto and Lieutenant Cantrell. Neither police official responded to the scene. Instead, pursuant to the initial plan to seize, tow and convert plaintiff's motorhome, defendants carried out with the seizure and tow of the motorhome.

45. Plaintiff continued to state to defendant police officers that the vehicle was not inoperable and that he was fully prepared to demonstrate that fact. Plaintiff also was prepared to move the motorhome to another location. Defendant police officers, however, refused to allow plaintiff to demonstrate the motorhome was operable, or to voluntarily move the vehicle to another location. Defendant Morgan abruptly announced that the motorhome would be towed, despite the statement of intent by plaintiff to demonstrate that the vehicle was in operable condition. When plaintiff moved to disconnect the electrical wires that were attached to external solar panels and move them to the center of the driver's door, defendant Morgan abruptly interrupted, stating that the vehicle would be towed. At that time, Morgan threatened plaintiff with forcible arrest if he did not immediately move away from the vehicle. By such use of police force, defendants individually and collectively prevented plaintiff from taking possession of the motorhome and driving it away on its own accord.

46. Throughout this time, plaintiff continued to protest the taking of his home, stating that the vehicle was neither abandoned nor inoperable, and demanding that he be entitled to move it on his own. He continued to request intervention of supervisory officials, but no such officers appeared. Plaintiff also requested an opportunity to enter into his motor home so that he could secure for safe transit, but defendants enjoined plaintiff – under the threat of arrest – refused. Instead, Officer Gonzalez entered the vehicle to secure a computer and monitor them from the desk and placing them on the bed, that being the only action he was willing to execute for safe transit of the motorhome and its contents.

47. At the pre-arranged direction of the Hayward Police, Jack James hurriedly hooked up the vehicle – failing to attach and secure the external cap for the gray water tank – and towed it away.

**DENIAL OF POST-SEIZURE HEARING FOR RETURN OF MOTORHOME**

48.    Later on that day and/or on the following day (October 22, 2020), plaintiff made repeated phone calls to the Hayward Police Department in an attempt to have a hearing on the forcible tow and removal of the motorhome. In connection with this effort, plaintiff repeated requested access to the written notice of abatement which the police officers had stated had been mailed to his prior address. This included calls to Lieutenant Cantrell, whose contact information had been provided to plaintiff for that purpose. Plaintiff called and spoke to Officer Faye Mahoney, who listened to plaintiff and understood his request for a hearing to explain the unlawful circumstances of the seizure and obtain the return of his motorhome. Although officer Mahoney took plaintiff's contact information and stated that she would get back to him, neither she nor anyone else returned his call forthwith. Thereafter, from October 23 until November 6, plaintiff had multiple contacts with Hayward Police department regarding his vehicle, his request for documentation of any notice and his attempt to gain the vehicle's return, but to no avail. This included multiple phone calls to Mahoney, Cantrell, Gonzalez and internal affairs Sergeant Gregory Velázquez.

49. On or about October 30, 2020, plaintiff received a phone call regarding the motorhome from defendant Hayward Police Lieutenant Wagner. Plaintiff expressed his desire to obtain a copy of the abatement notice which defendant Romero had allegedly sent to his former registered address, but Lieutenant Wagner responded that he was not involved in "abatement issues" and would have to contact Officer Romero.

50. On or about the same day, plaintiff finally had a conversation with Lieutenant Cantrell. This Lieutenant explained that he served in a supervisory capacity and had reviewed documentation related to the incident. He broadly asserted without particulars that everything was done legally according to police policies and regulations.

51. On or about November 6, 2020, plaintiff called and left a message with Sergeant Velázquez, and thereafter received a return phone call. Sergeant Velázquez remarked that there was nothing he could do to assist plaintiff in the return of his motorhome. Instead,

the officer recommended that plaintiff file a claim with the City of Hayward regarding the incident. After plaintiff demanded that he be given a hearing with respect to the seizure and tow of his motorhome, the Sergeant referred plaintiff back to Lieutenant Wagner. Sergeant Velázquez stated that defendant Wagner would be able to arrange for a hearing with respect to the vehicle abatement.

52. On or about November 6, 2020, pursuant to the Sergeant's direction, plaintiff contacted Lieutenant Wagner regarding the hearing. During the course of a telephone conversation between plaintiff and Wagner, Wagner made repeated assertions that he had reviewed the documents and police reports and that everything had been done legally. Plaintiff iterated his demand for a hearing, at which point, Wagner declared that "this phone call" is the hearing. Plaintiff objected, noting that he had not given any notice regarding the conduct of the hearing, had not been provided with the copy of any notice that had previously allegedly been mailed to him, and not yet been provided with any police reports or other documents or recordings that would be needed to confront Lieutenant Cantrell's broad assertion that everything was done legally and according to Hayward policies. When plaintiff questioned whether that phone call met with the police department's obligations to schedule a hearing pursuant to Vehicle Code §22852, the Lieutenant responded that he vehicle was abandoned and the code section therefore did not apply. This, of course, was part of the Hayward Police Department's plan all along: to declare contrary to clear evidence that plaintiff's obviously-occupied and continuously used motorhome was an "abandoned" vehicle. In this fashion, pursuant to Hayward's own policies, procedures custom and practices, defendants intended to deny plaintiff any procedural protections in connection with the taking of his motorhome.

53. During these interactions, no Hayward police officer informed plaintiff that his motorhome had been valued as less than $500 or otherwise state that plaintiff was going to be denied a hearing because of the perceived value of the vehicle. Under Hayward Ord. § 4-1.34, the City does not require notice of intention for removal of a vehicle "that is inoperable due to the absence of a motor, transmission, or wheels and incapable of being

towed, is valued at less than two hundred dollars ($200.00) by a person specified in Vehicle Code § 22855, and is determined by the City Council to be a public nuisance presenting an immediate threat to public health or safety, provided that the property owner has signed a release authorizing removal and waiving further interest in the vehicle or part thereof." In this case, none of the requirements for such a non-noticed removal has been met: the vehicle was not missing a motor, transmission or wheels and was not incabable of being towed; the vehicle was not valued at less than $200 by any official; the City Council did not determine the motorhome to be a public nuisance presenting a threat to health and safety; and there is no record of a release by any the real property owner or by Blickenstaff. Further, at no time did any Hayward police officer provide plaintiff with notice of any hearing as required by § 22852, where "the storing agency shall have the burden of establishing the authority for, and the validity of, the removal;" or the right to have storage costs waived when "reasonable grounds to believe that the vehicle was abandoned are not established" as required by § 22851.3(f).

54. During these interactions,  no Hayward police officer believed that the vehicle was properly abated as an abandoned or inoperable vehicle pursuant to a properly enacted abatement law. No police officer informed plaintiff that his motorhome had been abated pursuant to such an abatement law or program. The reason for the seizure and conversation – plaintiff's attempt to engage the officers in a discussion about the legality of the trespass allegation – could not meet any statutory or constitutional exceptions for proper notice, reasonable grounds or opportunity to be heard.

**EFFORTS TO RETURN ITEMS OF PERSONAL PROPERTY**

55. In addition to his efforts with the Hayward police to recover his motorhome, plaintiff also undertook diligent efforts to recover his personal belongings. On the afternoon of October 21, 2020 – the day the motorhome was taken from him – plaintiff went to the Hayward Police Department records office to obtain a personal property release form. After a request and some delay, plaintiff was provided with a release form listing a Jack James lot located at 549 C. Street in Hayward. At around 4:30 PM, plaintiff

traveled to that location, but found the office on the lot to be locked. Plaintiff then called

a posted telephone number and spoke with a Jack James employee. After identifying his

vehicle and explaining the purpose for his visit, the employee informed plaintiff that the

vehicle was not at the C. Street lot, but was instead in a Jack James lot at 42800 Boyce

Street, in Fremont. Plaintiff then made arrangements to meet someone after hours at the

Boyce Street lot. Plaintiff then traveled to Fremont, and after further delays, plaintiff was

met by a Jack James employee at approximately 6:30 PM. Due to his physical disability,

plaintiff asked that he be allowed to drive his other vehicle into the lot so he could

retrieve his personal items. This request was unreasonably denied. After plaintiff

provided the release form, the employee looked around the lot, and reported back to him

that the motorhome was not there. After further delays, plaintiff was informed that the

vehicle was in the Jack James lot at 23684 Connecticut Street in Hayward. After further

communications with the Jack James office, it was agreed that plaintiff would travel back

to Hayward and meet an employee at the Connecticut Street lot. At approximately 8:30 in

the evening, plaintiff found his motorhome and was allowed to enter.

56. Upon opening the door of the motorhome, plaintiff discovered that his cat (named

Pish) had been in the vehicle the entire time, traumatized and unsettled by the experience.

This caused plaintiff additional mental anguish that had already been caused by the

actions of defendants. Plaintiff also discovered contents of the vehicle in complete

disarray, having been strewn around the cabin during the tow, resulting from defendants'

refusal to allow him to secure loose items and cupboard doors prior to the tow.

57. Plaintiff recovered some of the items of personal property from the vehicle.

Plaintiff  arranged said items in an orderly assemblage next to the motorhome for the

purpose of the employee to inventory.  Said employee decried any responsibility to do so.

After plaintiff insisted, the employee conducted a cursory review and written list, but

refused to provide a copy as demanded by Plaintiff.  Plaintiff then expended considerable

effort on his own in an attempt to overcome his physical disability and hand-transport his

items outside the lot to his car. By 10 PM on that day, plaintiff had recovered his cat and

some additional items of personal property, and began his continuing period of homelessness living in his car. On a night subsequent to the taking of his motorhome, and a result thereof, plaintiff lost his pet when Pish – accustomed to be in and out of doors – escaped from plaintiff's car.

58. Two days later, plaintiff returned to the Jack James lot on Connecticut Street to retrieve additional items of personal property. After additional delays and excuses by Jack James, plaintiff was informed that the vehicle was no longer at the Connecticut Street lot, and had been moved to the Boyce Street lot in Fremont. When plaintiff pointed out that the Fremont lot was more than 10 miles from the location of the tow, a manager stated that Jack James could move plaintiff's motorhome to wherever Jack James wanted. The manager also falsely stated that the motorhome had leaked feces and urine from the time of the tow. Plaintiff knew that this statement was false, since he had not used a "black water" tank on his motorhome. He also knew that it was defendants' fault for not allowing him to secure the vehicle before the tow, as well as Jack James' negligence, for why there may have been gray water spillage during the tow. Thereafter, plaintiff traveled to the Jack James Fremont yard and inspected the motorhome. He discovered no leakage or appearance of damage to the underside of any tank, but observed that the cap was not secured to the flush valves of the tank, and apparently had not been secured prior to towing, which may have allowed grey water spillage during tow.

**DENIAL OF RETURN OF VEHICLE FROM JACK JAMES**

59. In addition to his efforts with Hayward police, plaintiff attempted to gain return of motorhome directly from Jack James. As a contractor for the city acting under color of law, Jack James had a duty to provide plaintiff with avenues for the return of his vehicle through statutorily prescribed procedures. This duty included providing plaintiff with notice of any lien sale – the public auction held by Jack James to satisfy any claims for fees, fines and costs associated with the towing and storage of the vehicle.

60. On or about November 20, 2020, plaintiff contacted Pat's Lien Service – a lien service agent hired by Jack James – and inquired about the status of the motorhome and

1   any notice of a lien sale. An employee at Pat's Lien Service informed plaintiff that a lien

2   sale notice had been mailed, and provided to plaintiff by email a copy of the notice.

3   Therein, Jack James stated it had mailed out a notice on October 22, 2020, with a lien sale

4   date of November 23, 2020, on the hour of 10:00 AM, at Jack James' Connecticut Street

5   lot. The lien sale document indicated that both the Hayward police and Jack James

6   considered plaintiff's vehicle to be valued at up to $4,000. In all of his discussion with

7   Hayward Police and Jack James regarding return of his vehicle, no defendant had ever

8   previously disclosed an intent to convert his motorhome by auction on November 23.

9   Moreover, in the notice, Jack James indicated it had mailed the notice to the wrong

10  address – using the correct P.O box number but the wrong zip code. This ensured that

11  notice would not likely reach plaintiff in a timely fashion.

12      61. In the notice plaintiff did not receive until November 20, 2020, Jack James stated

13  that plaintiff would be charged a towing fee of $225, a storage fee of $90 per day for each

14  day that it was held in Jack James' custody, and a lien sale cost of $70. For plaintiff, that

15  was a hefty price to pay for the experience of having one's home forcibly and unlawfully

16  taken from him by defendants. Having experience with lien sales, plaintiff determined to

17  attend the auction of his motorhome at the time and place stated in the notice, so that he

18  could purchase it and take it back into his possession. Issuance of the Jack James' lien

19  sale notice establishes that defendants, including Hayward police officers, had not

20  removed plaintiff's motorhome pursuant to the City's Abandoned Vehicle Abatement

21  ordinance, which required removal of the vehicle to a scrap yard or dismantler and which

22  prohibited its reconstruction or being made operable.

23      62. Plaintiff went to the Jack James Connecticut Street lot on November 23, 2020 –

24  the day of the noticed lien sale. Plaintiff arrived at approximately 8:00 AM, and he waited

25  until after 10:00 AM, but the entire lot was closed and no one was present. No lien sale of

26  his vehicle or any other vehicle took place during that time. Later on that day, plaintiff

27  spoke to the Jack James office regarding the lien sale, and was informed that an auction

28  would take place the following day, November 24. Plaintiff was further informed the Jack

1   James manager with whom plaintiff had previously interacted would conduct the auction.

2      63. On November 24, 2020, plaintiff visited the Connecticut Street lot, starting before

3   8:00 AM. In contrast to the noticed date of November 23, on this day Jack James

4   employees were engaged in activities as a prelude to a lien sale and people began to

5   gather for an auction. At 9:00 AM, the premises were opened up for inspection of the

6   vehicles, and at approximately 10:00 AM, an auction was conducted by the same Jack

7   James manager with whom he had interacted. Although plaintiff searched the yard and

8   attended the entire auction, his motorhome was not found to be present or sold.

9      64. On or about November 29, 2020, plaintiff spoke with the Jack James office again

10  regarding the motorhome. Plaintiff expressed a desire to return and retrieve additional

11  items of personal property. During the telephone call with a Jack James employee,

12  plaintiff was told conflicting falsehoods, including:

13          – The vehicle had cleared liens that day and had most likely been sold;

14          – The vehicle had cleared lien and was sold on November 23 at 10AM;

15          – The vehicle went on auction on November 24;

16          – The vehicle may have gone to Pick-n-Pull; and

17          – The vehicle belongs to the tow company.

18     65. The following day, plaintiff went to the Jack James lot in Fremont to investigate

19  his stolen motorhome. Peering through the fence from an adjacent parking lot, plaintiff

20  could see that his motorhome on the premises, apparently hooked up to a tow vehicle. The

21  presence of the motorhome establishes that defendants, including Hayward police, had

22  not removed plaintiff's motorhome pursuant to the City's Abandoned Vehicle Abatement

23  ordinance, which required removal of the vehicle to a scrap yard or dismantler and which

24  prohibited its reconstruction or being made operable. Plaintiff contacted the Fremont

25  police and reported his stolen vehicle. Although the Fremont police came out and spoke

26  to Jack James employees regarding the vehicle, Jack James merely informed plaintiff that

27  the vehicle was not there and that it now belonged to the tow company. Upon further

28  inquiry, the Jack James employee stated vaguely that the vehicle was in Livermore.

1   66. On or about the following day, plaintiff again attempted to report his stolen

2   vehicle with the Fremont police, but several days later, he was directed to contact Jack

3   James directly. Following that direction, plaintiff spoke to an employee in the Jack James

4   office. After a further discussion, plaintiff was informed that because the Hayward police

5   had not provided appropriate release papers, the vehicle was "gone."

6   67. Thereafter, plaintiff made repeated contacts with the Hayward Police Department

7   in an attempt to get them involved into the investigation and return of his motorhome.

8   Pursuant to the collective plan described herein, as well as the policy, practice and custom

9   of the Hayward Police Department also described herein, defendants failed to investigate

10  or take reasonable efforts to return plaintiff's motorhome.

11  68. Thereafter, plaintiff engaged with the Hayward City Attorney regarding the

12  matter. After an in-depth conversation – where plaintiff disclosed all material facts

13  presented by this action – plaintiff requested Hayward take action and secure the return of

14  his wrongfully seized home. Despite knowledge of the matters presented by plaintiff, the

15  City Attorney's office failed to respond to plaintiff's request, or otherwise take reasonable

16  measures to return the home that defendants had taken from plaintiff.

17  **DAMAGES**

18  69. Defendants' actions, as described herein, were made intentionally and for an

19  improper purpose, and taken with malice, oppression and fraud.

20  70. Defendants' actions, as described herein, were conducted under color of state law,

21  using force or the threat of force, to deprive plaintiff of his constitutional rights, including

22  due process, under the California and United States Constitutions.

23  71. As result of the collective and individual actions of defendants as described herein,

24  plaintiff was deprived of his motorhome and items of personal property therein; he was

25  rendered homeless and forced to sleep in a vehicle; he lost his pet cat who had been

26  traumatized by the incident, a loss which further traumatized plaintiff; his psychological

27  and physical disabilities were made substantially worse; and he has suffered and

28  continues to suffer great psychological injury and emotional distress.

**CLAIMS STATUTE**

72. Plaintiff has complied with all of the administrative prerequisites for bringing this action and his claims are procedurally ripe for adjudication before this Court. On or about April 29, 2021, plaintiff presented a formal claim regarding his injuries with the City of Hayward. The City denied the claim by letter dated June 22, 2021.

73. The City of Hayward is joined as a defendant to all claims here. With respect to plaintiff's state law claims, this defendant is joined in this action pursuant to Government Code §815.2(a), because it is a public entity liable for injury proximately caused by the acts or omissions of defendant officers and employees. The city is liable for federal civil rights violations because its own actions and inactions as performed by managers and supervisors, failure to adequately train, hire, retain and supervise its employees, contractors or officers, its ratification of defendants' and agents' actions and inactions, and its official customs, policies and procedures which were a substantial factor in causing the injuries.

**CLAIM ONE**
**(Fourth Amendment – Seizure Without Probable Cause, 42 U.S.C. § 1983)**

74. Plaintiff hereby incorporates and realleges paragraphs 1 through 73.

75. The actions and inactions of defendants as set forth herein, constituted unlawful and unconstitutional conduct, taken under color of law, including violating plaintiff's Fourth Amendment right to be secure in his person, house, papers and effects, against unreasonable searches and seizures. Under the Fourth Amendment, defendants' warrantless seizure was "*per se* unreasonable." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993). Defendants are unable to meet their burden of showing that the seizure of the motorhome comes "under one of a few specifically established exceptions to the warrant requirement." *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005) (quoting *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001)).

76. Under clearly established legal norms related to the seizure of vehicles, defendants are liable under 42 U.S.C. § 1983 for seizing, retaining and disposing of the motorhome

without a warrant and without probable cause to believe that it was abandoned, wrecked, dismantled or inoperable. Because plaintiff used the vehicle as his home, defendants are also liable under § 1983 because they violated clearly established Fourth Amendment law protecting against the unreasonable seizure of homes.

77. All objective evidence indicated that Blickenstaff did not intend to abandon the motorhome, and defendants' subjective beliefs held that plaintiff had not abandoned the motorhome. When plaintiff moved to demonstrate that the vehicle was operable and he offered to remove the vehicle on his own accord, defendants physically prevented him from doing so, threatening him with arrest if he did not move away from the motorhome. This fact establishes conclusively that defendants knew that the vehicle was in operating condition. Defendants knew that they did not, and could not, remove the vehicle for probable cause based upon abandonment, as demonstrated by their failure to follow the City's ordinances regarding scrapping and dismantling of the vehicle. Defendants' disposal of the motorhome permanently deprived plaintiff of the use, enjoyment and peace of mind of having his home. These breaches of plaintiff's Fourth Amendment rights violated §1983.

78. All objective evidence and defendants' subjective beliefs also demonstrate that there was no basis to believe under the community caretaking doctrine that the vehicle posed an impediment to traffic, presented a risk to any other vehicle or driver, or was subject to theft or vandalism. Since there was no basis to believe the vehicle had been abandoned or inoperable, there was no reasonable basis to believe that it required community caretaking. Further, because the motor home served as plaintiff's home, under clearly established law there was no basis under the community caretaking doctrine to seize the motor home and deprive plaintiff of his right to possession and use. In addition, the facts that the vehicle was parked on a private road and the City Council had not properly asserted regulatory authority under § 21107.7, forecloses any determination that the removal was for caretaking purposes. Defendants knew this to be the case at the time.

79. The actions and/or omissions of the City, police officers, and Jack James managers, employees and agents, as well as DOE defendants, leading to the injuries to plaintiff, were the direct result of actions taken on behalf of the Hayward City Council pursuant to its Abandoned Vehicle Abatement ordinances. Further, the constitutional violations in this count were the direct result of policies, standing customs and practices, supervision, and decision-making of the City, as described herein, rising to the level of official policy. Without limitation, such policies, customs and practices include the unlawful use of the Abandoned Vehicle Abatement program to separate undesirable residents from their vehicles and motorhomes with knowing that the vehicles were not actually abandoned, or acting with reckless disregard to objective facts of non-abandonment, under flawed ordinances that fail to impose appropriate constitutional and statutory limitations on the abatement orders and decisions. Similarly, the City's failure to properly train, hire, retain and supervise its officers, employees and contractors, and its ratification of the actions taken, as alleged herein, constitutes a sufficient basis for the City's liability under the *Monell* doctrine on grounds other than *respondeat superior*. Moreover, the specific involvement of supervisors and managers, as well as the egregious nature of these coordinated actions, are sufficient to warrant a finding that the actions identified herein are attributable to inadequate training or supervision amounting to gross negligence on the part of City officers and officials involved.

80. As a result of these actions, plaintiff has suffered and will continue to suffer economic losses, and physical and psychological injuries, in amounts to be proven at trial.

**CLAIM TWO**
**(Eighth Amendment – Excessive Fines and Punishment, 42 U.S.C. § 1983)**

81. Plaintiff hereby incorporates and realleges paragraphs 1 through 73.

82. Under the Eighth Amendment to the United States Constitution, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." In 2019, the Supreme Court made clear that this proscription applied to the States through the Fourteenth Amendment, because "if a Bill of Rights protection is

1    incorporated, there is no daylight between the federal and state conduct it prohibits or

2    requires." *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019).

3        83. Under clearly-established law, the seizure, tow, taking and conversion of

4    plaintiff's motor home constituted excessive fines and punishment for alleged parking or

5    trespass violations, and for attempting to enter into a discussion with the officers about

6    the legality of the tow. Because the purpose of the tow, seizure and permanent deprivation

7    of the right to possess and use the motor home was at least in part to punish plaintiff for,

8    and deter him from, illegal parking, trespass violations and alleged "non-cooperation"

9    (i.e., arguing with) the police officers' proclamation, the police action constitutes

10   "punishment" under Eight Amendment jurisprudence.  As a result, the seizure, tow and

11   and conversion of the motorhome constituted a "fine." Moreover, the remedial nature and

12   deterring purpose if the police officers, to recover the costs of towing, storage and

13   impoundment of the motor home, and to deter persons from illegal parking or contesting

14   police declarations, require the conclusion that the police action constituted a "fine."

15       84. Clearly established law demonstrates that the fine was excessive. Because the

16   police action was the permanent deprivation of plaintiff's home, it was clearly out of

17   proportion to the gravity of the offense. Loss of plaintiff's home is one of the most harsh

18   penalties that can be imposed on a person, particularly a person such as plaintiff, who

19   suffers from disabilities, is of limited means, and who could not readily afford alternative

20   living arrangements. The taking of his motor home rendered plaintiff homeless, requiring

21   him to sleep in his car for nearly a year. The taking also deprived him a tens of thousands

22   of dollars in value and hundreds of thousands of dollars worth of peaceful integrity and

23   privacy. Plaintiff could not afford to pay this price, and the result was the complete

24   deprivation of his home, privacy and peace of mind. The extent of the harm caused by the

25   fine imposed thus weighs heavily on the scale of excessiveness. Similarly, the nature of

26   the alleged crime weighs heavily against imposition of such a fine. Plaintiff was not in

27   fact illegally parked, there was no prior notice to him that he was in trespass and was

28   required to move, the police officers did not allow plaintiff to move the vehicle on his

own accord, a person who just learns of an accusation of trespass should be given reasonable time to move from the premises, and the only real reason behind the police action was the insistence that plaintiff not argue about the legality of the trespass allegation – a right to ask questions of police that the constitution provides to its citizens. No court ever adjudicated these allegations or found plaintiff guilty of an offense. Moreover, plaintiff was never accused of engaging in any criminal behavior in his motor home or through the use of his motorhome. The alleged parking, trespass and "non-cooperation" infractions – none of which were ever charged or prosecuted – were unrelated to any alleged criminal conduct on the part of plaintiff. Other penalties could have been imposed, including a simple demand that plaintiff move his vehicle at the time of the reinspection, an option which plaintiff expressly requested and was intentionally denied. Another less penalizing action would have been to issue plaintiff a parking ticket, which at most would have resulted in some tens of dollars in a fine, rather than the heavy costs imposed. Rending plaintiff homeless in the current environment – including the heart of the pandemic – provides further circumstances establishing the excessiveness of the fine. Even the California legislature and the City Council did not intend to impose such a heavy fine on persons in plaintiff's position for the reasons behind the action.

85. Prior to the seizure, tow and conversion of plaintiff's motorhome, defendants did not provide plaintiff with any notice that he was trespassing on private property, nor inform plaintiff that the owner of the property wanted his vehicle to be removed. Nor did defendants ticket plaintiff's motorhome as illegally parked, other than the false claim that the vehicle was abandoned or inoperable (it was neither, as defendants knew). Defendants did not previously ask plaintiff to move his vehicle from the spot where it was parked, and at the time of the tow, plaintiff was prevented from moving the motorhome on its own. Nevertheless, in this action, City defendants indicated that plaintiff's vehicle was towed and disposed of because it was illegally parked on private property.

86. The permanent taking of plaintiff's motorhome was an excessive punishment or fine imposed on plaintiff for the alleged violations of illegal parking and/or trespass, and

1  for not immediately complying without question with the police officer's trespass

2  declaration. Plaintiff was not, in fact, engaged in illegal parking or trespass. Nor was he

3  convicted of such offenses. Nevertheless, even if plaintiff had engaged in such minor

4  infractions, or had been charged with such offenses, the permanent taking of his vehicle

5  and home constituted an excessive fine or punishment, as it was not in proportion to the

6  infraction and did not consider disruption to plaintiff's life and liberty caused thereby.

7      87. Under clearly established legal norms related to the Eighth Amendment,

8  defendants are liable under 42 U.S.C. § 1983 for imposing a fine or punishment on

9  plaintiff for alleged illegal parking and trespass in the form of seizure, removal and

10  disposition of plaintiff's home.

11      88. The actions and/or omissions of the City, police officers, and Jack James

12  managers, employees and agents, as well as DOE defendants, leading to the injuries to

13  plaintiff, were the direct result of actions taken on behalf of the Hayward City Council

14  pursuant to its Abandoned Vehicle Abatement ordinances. Further, the constitutional

15  violations in this count were the direct result of policies, standing customs and practices,

16  supervision, and decision-making of the City, as described herein, rising to the level of

17  official policy. Without limitation, such policies, customs and practices include a written

18  ordinance and implementing practices and policies which do not restrict abatement

19  authority to non-punitive removal of public nuisances, or otherwise prevent removing

20  officers from using the program to excessively punish or fine owners for petty parking

21  violations or other minor infractions. Similarly, the City's failure to properly train, hire,

22  retain and supervise its officers, employees and contractors, and its ratification of the

23  actions taken, as alleged herein, constitutes a sufficient basis for the City's liability under

24  the *Monell* doctrine on grounds other than *respondeat superior*. Moreover, involvement

25  of supervisors and managers, and the egregious nature of coordinated actions, warrant a

26  finding that actions taken are attributable to inadequate training or supervision amounting

27  to gross negligence on the part of City officers and officials involved.

28

89. As a direct and proximate result of these actions, plaintiff has suffered and will continue to suffer economic losses, and physical and psychological injuries, in an amount to be proven at trial.

## CLAIM THREE
### (Fifth Amendment – Taking without Compensation)

90. Plaintiff hereby incorporates and realleges paragraphs 1 through 73, and 82 through 89.

91. The Fifth Amendment of the United States Constitution, as applied to the States through the Fourteenth Amendment, provides that private property shall not be taken for public use without just compensation. Seizing plaintiff's motor home and converting or allowing the towing service to scrap or convert the vehicle, without return of any value to plaintiff as the rightful owner, as alleged herein, violates the Takings Clause.

92. Plaintiff had a vested right in his motor home, and he possessed legal title to the motorhome. Plaintiff also owed equity in his motor home and his other belongings that he maintained in the motor home. Defendants took that property by seizing, towing, scrapping and/or converting the motor home as alleged herein.

93. The motor home was worth more than the amount of costs that properly could have been imposed on plaintiff for the alleged offenses, including the towing and storage fees associated with the seizure and impoundment. Yet, defendants took and sold, scrapped, kept or otherwise disposed of the motor home without returning any surplus value to plaintiff. Defendants choice of converting the vehicle under its "abatement" program does not extinguish plaintiff's vested property rights in his motor home, or in its equity. Nor does the abatement program eliminate defendants' constitutional duty to reimburse plaintiff for the taking.

94. Defendants acted under color of state law when they took plaintiff's motor home without compensation. Defendants' action was motivated by its contractual arrangement between the city and Jack James towing service, whereby the city would receive financing or subsidy for their towing program at not cost to the city. These actions were

1 taken pursuant to the city's contracts, ordinances, policies and customs, as alleged herein.

2  95. As a result of defendants' conduct as described in this complaint, plaintiff has

3 suffered and continues to suffer irreparable harm to his constitutional rights.

4 Accordingly, plaintiff respectfully ask that this Court enter a judgment declaring that

5 defendants' conduct violates the Fifth and Fourteenth Amendments to the United States

6 Constitution, and order that plaintiff be made whole for the constitutional violation.

7       **CLAIM FOUR**
   **(Fourteenth Amendment – Pre-Seizure Notice and Hearing, 42 U.S.C. § 1983)**

8  96. Plaintiff hereby incorporates and realleges paragraphs 1 through 58.

9  97. The actions and inactions of defendants as set forth herein, constituted unlawful

10 and unconstitutional conduct, taken under color of law, including violating plaintiff's

11 Fourteenth Amendment rights against deprivation of "property, without due process of

12 law," by the seizing of plaintiff's motorhome without prior notice or opportunity to be

13 heard regarding its seizure. At the core of the Due Process Clause guarantee is

14 pre-deprivation notice – some advance warning that the government is going to take your

15 property – and a meaningful chance to challenge the deprivation before it happens.

16 *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The opportunity to be heard must be

17 given "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S.

18 545, 552 (1965).

19  98. "Loss of the use and enjoyment of a car deprives the owner of a property interest

20 that may be taken from him only in accordance with the Due Process Clause." *Stypmann*

21 *v. City & Cty. of San Francisco*, 557 F.2d 1338, 1342 (9th Cir. 1977). In the context of

22 vehicle tows, a person has a right in continued possession of their cars, and the law

23 recognizes that the government's seizure causes significant hardship. *Clement v. City of*

24 *Glendale*, 518 F.3d 1090, 1094 (9th Cir. 2008); *Scofield v. City of Hillsborough*, 862 F.2d

25 759, 762 (9th Cir. 1988) ("The uninterrupted use of one's vehicle is a significant and

26 substantial private interest). Moreover, because Blickenstaff lived in his motorhome at the

27 time defendants took it from him, plaintiff's due process rights are comparable to the

28

condemnation of his home. *See Fitzpatrick v. City of Dearborn Heights*, 1999 U.S. App. LEXIS 10909, at *5 (6th Cir. May 21, 1999) ("In the absence of an exception to the normal due process requirements, Dearborn Heights lacked the power to condemn the Fitzpatricks' home without a predeprivation procedure, including notice and a hearing"); *Kraft v. Wells Fargo & Co.*, 2016 U.S. Dist. LEXIS 160880, at *8 (D.N.J. Nov. 21, 2016) (no notice or pre-deprivation hearing on condemnation violated Due Process Clause).

99. As alleged herein, defendants did not provide plaintiff with notice and meaningful opportunity to be heard regarding the removal and abatement of his motorhome as an abandoned or inoperable vehicle, or the seizure and towing of the vehicle for an alleged trespass, or for seeking to enter into a discussion with the officers regarding the legality of the police action. At the time of the seizure and tow, defendants knew that plaintiff had not and would not receive written notice that they were there to conduct a re-inspection of the vehicle to determine if it was abandoned or inoperable. Defendants also knew that plaintiff had not and would not receive any notice that he was being accused of trespass or illegal parking on a private road, and that the motor home would be summarily subject to immediate seizure and deprivation if he asked questions to challenge the legality of the threatened police action. The notice that defendants were required to provide to plaintiff would have informed plaintiff of his rights to reinspection, but defendants purposefully avoided giving plaintiff notice or an opportunity to participate in the vehicle inspection. Defendants also knew that the yellow sticker did not provide plaintiff with notice of a right to contest the removal of his vehicle other than to demonstrate that it was operable in front of the police officers and Jack James employees present on October 21, 2020, at the time of reinspection. They also knew that the yellow sticker did not inform plaintiff of his right to a hearing before an Enforcement Officer authorized to act on behalf of the City Council. The yellow sticker also failed to constitute proper notice in light of the fact that reasonable grounds were absent to find the motorhome to be abandoned under Vehicle Code § 22669, and that the police officers believed the vehicle to be parked illegally upon a private road, and to be in trespass without permission.

100. Under clearly established legal norms related to pre-seizure notice for the abatement or seizure of vehicles, defendants are liable under 42 U.S.C. § 1983 for seizing, retaining and disposing of the motorhome without prior notice or a hearing where the City has the appropriate burden of demonstrating that the vehicle was abandoned or inoperable, was parked illegally upon a private road, or was accused of being there in trespass. Defendants' disposal of the motorhome permanently deprived plaintiff of the use, enjoyment and peace of mind of having his home, and it was without prior notice. Defendants therefore violated Fourteenth Amendment duties under §1983.

101. The actions and/or omissions of the City, police officers, and Jack James managers, employees and agents, as well as DOE defendants, leading to the injuries to plaintiff, were the direct result of actions taken on behalf of the Hayward City Council pursuant to its Abandoned Vehicle Abatement ordinances. Further, the constitutional violations in this count were the direct result of policies, standing customs and practices, supervision, and decision-making of the City, as described herein, rising to the level of official policy. Without limitation, such policies, customs and practices include the unlawful use of the Abandoned Vehicle Abatement program to separate undesirable residents from their vehicles and motorhomes without effective prior notice to the owners, using the City's flawed ordinances which allow the City to avoid holding actual hearings on vehicle abatements and which waives the rights of vehicle owners to request hearings when such requests are made within 10 days of actual or confirmed receipt of said notice. Similarly, the City's failure to properly train, hire, retain and supervise its officers, employees and contractors, and its ratification of the actions taken, as alleged herein, constitutes a sufficient basis for the City's liability under the *Monell* doctrine on grounds other than *respondeat superior*. Moreover, the specific involvement of supervisors and managers, as well as the egregious nature of these coordinated actions, are sufficient to warrant a finding that the actions identified herein are attributable to inadequate training or supervision amounting to gross negligence on the part of City officers and officials involved.

102. As a direct and proximate result of these actions, plaintiff has suffered and will continue to suffer economic losses, and physical and psychological injuries, in an amount to be proven at trial.

**CLAIM FIVE**
**(Fourteenth Amendment – Post-Seizure Hearing, 42 U.S.C. § 1983)**

103. Plaintiff hereby incorporates and realleges paragraphs 1 through 73, and 97 through 102.

104. The Fourteenth Amendment rights against deprivation of "property, without due process of law" requires post-seizure notice and a hearing before final deprivation of a property interest. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982) ("[I]t has become a truism that '*some* form of hearing' is required before the owner is finally deprived of a protected property interest.") (citation omitted) (original emphasis).

105. In enacting Vehicle Code § 22852, the California legislature provided vehicle owners with specific post-towing hearings rights, including the requirement that the towing agency notify the legal or registered owner of a towed vehicle in person or by mail within forty-eight hours of the tow, and that it inform the owner of the right to receive a post-towing hearing if requested in person, in writing, or by telephone within ten days of the date of the notice. Section 22852 was enacted following the Ninth Circuit decision in *Stypmann* that due process requires a prompt post-tow hearing. *See Stypmann*, 557 F.2d at 1344 ("Seizure of property without prior hearing has been sustained only where the owner is afforded prompt post-seizure hearing at which the person seizing the property must at least make a showing of probable cause"); *Goichman v. Rheuban Motors, Inc.*, 682 F.2d 1320, 1323 (9th Cir. 1982) (constitutional deficiency identified in *Stypmann* was remedied by enactment of Cal. Veh. Code § 22852); *Scofield*, 862 F.2d at n.3 (same).

106. As alleged herein, through a labyrinth of bureaucratic traps, Blickenstaff's repeated requests for a hearing and return of his motorhome were summarily denied, in violation of clearly established Fourteenth Amendment duties. Moreover, defendants did not provide a basis for return of the vehicle and waiver of storage grounds under Vehicle

1  Code § 22851.3(f) even though "reasonable grounds to believe that the vehicle was

2  abandoned [was] not established."

3      107. Defendants had no basis to deny hearing rights on the grounds of any exceptions

4  contained in the City's ordinance or the Vehicle Code Provisions. The exceptions in

5  Vehicle Code § 22852(f) or (g) does not provide relief from liability for constitutional

6  violations in this case. As alleged herein, plaintiff was deprived of his motor home

7  because defendants accused him of being parked illegally on a private road, and because

8  the officers did not like the fact that plaintiff questioned the proclamation of trespass.

9  Under these facts, the vehicle code sections dealing with abandoned or abated vehicles

10  simply does not apply. Moreover, as demonstrated by the facts alleged herein, by the

11  issuance of the notice of lien sale of plaintiff's motorhome valued up to $4,000, and its

12  presence on and movement between Jack James lots, defendants did not removed

13  plaintiff's motorhome pursuant to the City's Abandoned Vehicle Abatement ordinance.

14  Such an action would require reasonable grounds to believe that the vehicle had been

15  abandoned or inoperable, and defendants knew that it was neither. Moreover, the

16  abatement program would have required removal of the vehicle to a scrap yard or

17  dismantler, and it prohibited its reconstruction or being made operable. Since defendants

18  knew that the vehicle was going to be sold, and then it was converted for Jack James to

19  keep in value, defendants knew that it was not subject to any statutory exception.

20  Moreover, subsection (f) does not provide a basis to avoid Due Process violations because

21  (1) probable cause was lacking to determine the vehicle was abandoned; (2) plaintiff was

22  not afforded pre-deprivation notice as described herein; (3) defendants knowingly

23  attempted to avoid affording plaintiff his right to a hearing by falsely asserting that the

24  motorhome came within its abandoned vehicle abatement program; and (4) the city's

25  abandoned vehicle abatement program, as applied to the removal of plaintiff's motor

26  home, did not comply with vehicle code provisions or the Fourteenth Amendment's right

27  to Due Process. Similarly, Vehicle Code § 22852(g) does not apply because reasonable

28  grounds were lacking to find the vehicle abandoned § 22669 and the value of the vehicle

was not, and could not be, estimated to be below $500. This too is established by the fact that defendants issued a lien sale notice and converted the vehicle for private use rather than dismantle the vehicle pursuant to the ordinance. In addition, the exception in Hayward Ord. § 4-1.34 does not apply because the motorhome was not inoperable due to the absence of a motor, transmission, or wheels, it was not valued at less than $200, it was not determined by the City Council to be a public nuisance, and neither Blickenstaff nor any property owner signed a release authorizing the removal and waiving further interest in the vehicle. Finally, whether or not the statutory exception applies, the constitution required some notice and right to be heard before the permanent deprivation of plaintiff's right to enjoy his motor home. The constitutional rights apply whether or not the statute also required such a hearing. As applied in this case, the ordinance and statutory provision, together, failed to comport with constitutional requirements.

108. Under clearly established legal norms related to post-seizure notice for towed vehicles, defendants are liable under 42 U.S.C. § 1983 for seizing, retaining and disposing of the motorhome without notice or a right to a meaningful hearing before final disposition of the motorhome. Defendants' disposal of the motorhome without a post-seizure opportunity for hearing and return of the vehicle permanently deprived plaintiff of the use, enjoyment and peace of mind of having his home, in violation of defendants' Fourteenth Amendment duties under §1983.

109. The actions and/or omissions of the City, police officers, and Jack James managers, employees and agents, as well as DOE defendants, leading to the injuries to plaintiff, were the direct result of actions taken on behalf of the Hayward City Council pursuant to its Abandoned Vehicle Abatement ordinances. Further, the constitutional violations in this count were the direct result of policies, standing customs and practices, supervision, and decision-making of the City, as described herein, rising to the level of official policy. Without limitation, such policies, customs and practices include a written ordinance which does not provide for post-seizure hearings for the return of towed vehicles or waiver of storage costs upon failure of the City or removing officers to

establish authority for, and the validity of, the removal, or when "reasonable grounds to believe that the vehicle was abandoned are not established." Similarly, the City's failure to properly train, hire, retain and supervise its officers, employees and contractors, and its ratification of the actions taken, as alleged herein, constitutes a sufficient basis for the City's liability under the *Monell* doctrine on grounds other than *respondeat superior*. Moreover, the specific involvement of supervisors and managers, as well as the egregious nature of these coordinated actions, are sufficient to warrant a finding that the actions identified herein are attributable to inadequate training or supervision amounting to gross negligence on the part of City officers and officials involved.

110. As a direct and proximate result of these actions, plaintiff has suffered and will continue to suffer economic losses, and physical and psychological injuries, in an amount to be proven at trial.

**CLAIM SIX**
**(Conspiracy to Deprive Plaintiff of Constitutional Rights, 42 U.S.C. §1983)**

111. Plaintiff hereby incorporates and realleges paragraphs 1 through 110, exclusive of repetitive allegations.

112. The actions and inactions of defendants as set forth herein, constituted unlawful joint action, concerted effort, collusion and conspiracy, taken under color of law, to violate plaintiff's Fourth, Fifth, Eighth and Fourteenth Amendment rights. The particular facts alleged herein demonstrate that defendants reached an agreement and meeting of the minds to seize plaintiff's motorhome without reasonable grounds or probable cause, without pre- or post-seizure notice and meaningful opportunity to be heard, as an excessive fine or punishment for minor alleged infractions or for attempting to engage in a discussion with the officers over the legal basis for the police action, and as a Taking without just compensation, by towing the motorhome under threat of force to a Jack James location where plaintiff's access would be limited, and by thereafter convert the vehicle without proper notice or right to participate in a lien sale. Defendants made these agreements and took these concerted actions with the intent of robbing plaintiff of his

1   home and depriving him of his constitutional rights in violation of §1983. Defendant

2   police officers' agreement to permit, support, ratify and participate in the Abandoned

3   Vehicle Abatement officers unilateral and unlawful decisions to take plaintiff's

4   motorhome, as well as their agreements with Jack James and its managers, can be proven

5   by direct evidence and may also be inferred by circumstances showing that the acts and

6   inactions alleged herein would have been unlikely to have been undertaken without an

7   agreement. Plaintiff identifies the time period for the conspiracy, its object and the actions

8   taken to achieve those objects, and he demonstrates a connection between the conspiracy

9   and plaintiff's injuries.

10   113. As a direct and proximate result of these actions, plaintiff has suffered and will

11   continue to suffer economic losses and physical and psychological injuries, in an amount

12   to be proven at trial.

13   **CLAIM SEVEN**
    **(CIVIL CODE §52.1, The Tom Bane Civil Rights Act)**

14
    114. Plaintiff hereby incorporates and realleges paragraphs 1 through 113, exclusive
15
    of repetitive allegations.
16
    115. The actions and inactions of defendants as set forth herein, constituted unlawful
17
    interference with rights secured by the Constitutions and laws of the United States and of
18
    California, including the California Constitution, Article 1, §§ 1 and 13, by use of threats,
19
    intimidation and/or coercion, as defined under The Tom Bane Civil Rights Act, California
20
    Civil Code §52.1. Through their intentional actions and inactions, defendants knowingly
21
    seized plaintiff's motorhome using physical force without probable cause under the
22
    Fourth Amendment or reasonable grounds under Vehicle Code §§ 22669 and 22650,
23
    based upon a knowingly false claim of vehicle "abandonment"; without Due Process
24
    required by the Fourteenth Amendment and Vehicle Code § 22852; to impose excessive
25
    fine and punishment for alleged minor infractions or to punish and deter plaintiff from
26
    attempting to engage the officers in a discussion over the legality of the tow, and to take
27
    plaintiff's vehicle without compensation in order to finance or subsidize the city's towing
28

program. Defendants further used force and the threat of arrest to bar plaintiff from taking

possession of his motorhome, removing it on its own accord or otherwise prevent its

removal, in violation of these same constitutional and statutory provisions. Said acts were

not committed by law to the discretion of any officer and employee, and they were taken

in excess of constitutional and statutory limits and therefore without authority to order

abatement of plaintiff's motorhome. These actions were undertaken with the intent of

interfering with plaintiff's constitutional and statutory rights.

116. As a direct and proximate result of these actions, plaintiff has suffered and will

continue to suffer economic losses and physical and psychological injuries, in an amount

to be proven at trial, and plaintiff is entitled to an award for treble damages, penalties up

to $25,000, and attorneys fees.

**CLAIM EIGHT**
**(Conversion)**

117. Plaintiff hereby incorporates and realleges paragraphs 1 through 116, exclusive

of repetitive allegations.

118. At all times relevant hereto, plaintiff had ownership and rights to possession of

the motorhome that is the subject of this action, as well as items of personal property and

plaintiff's pet cat Pish.

119. Through the actions and inactions of defendants, as described herein, defendants

disposed of plaintiff's property in a manner inconsistent with plaintiff's right to possess

and use such items of personal property, including the unjustified failure to return said

property after a lawful demand by plaintiff.

120. At all times relevant to this complaint, defendants' disposition of plaintiff's

property – including the permanent taking of plaintiff's motorhome – was done in a

manner inconsistent with plaintiff's right to possess such property, as well as other

property rights secured by state and federal law.

121. The City of Hayward is joined as a defendant to this count under Government

Code §815.2(a), because it is a public entity liable for injury proximately caused by the

acts or omissions of defendant officers and employees.

122. As a direct and proximate result of these actions, plaintiff has suffered and will continue to suffer economic losses, and physical and psychological injuries, in an amount to be proven at trial.

## PRAYER

Wherefore, plaintiff prays for judgment against defendants, and each of them as follows:

1. For general and special damages, including economic losses, pain, suffering, physical and psychological injuries, expenses and other damages, in an amount to be proven at trial;

2. For treble damages and penalty of $25,000 for each violation of Civil Code §52.1.

3. For exemplary damages against individual defendants;

4. For reasonable attorney's fees and costs to the plaintiff, pursuant to 42 U.S.C. §1988, Code of Civil Procedure §1021.5, Civil Code §52.1, and any other applicable provision of law.

5. For costs of this action to the plaintiff; and

6. For other such relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff hereby demands trial by jury for all triable claims and issues.

Respectfully submitted,

February 10, 2023          /s/Jeremy L. Friedman
                          Jeremy L. Friedman
                          Attorney for plaintiff Evan Blickenstaff

# EXHIBIT A

 

# WARNING

This vehicle is declared to be abandoned, wrecked, dismantled or inoperative and is parked in violation of Hayward Municipal Code Section 4-1.20 and California Vehicle Code Section 22660.

To comply with the law, this vehicle must either be:

    1. Removed to a licensed dismantler or wrecking yard, OR;
    2. Completely enclosed within a garage or building, OR;
    3. Restored to normal operating service and demonstrated to be operable.

One of the above abatement methods must be completed or the City of Hayward will have the vehicle removed, in which case the vehicle may not again be registered or made operable.

Vehicle Make / Model: _____

Location: _____

For information, contact Hayward Police Abandoned Vehicle Abatement at 510-293-7179.

AVA Officer:_____   Badge: _____   Date: _____

= = = = = ABATEMENT NOTICE BY MAIL TO FOLLOW = = = = =

# EXHIBIT B



# WARNING

YOUR OCCUPATION OF THIS PROPERTY IS UNLAWFUL. UNDER AUTHORITY OF CALIFORNIA PENAL CODE 602(O) AND/OR HAYWARD MUNICIPAL CODE 4-2.40 YOU MAY BE SUBJECT TO ARREST FOR TRESPASSING. YOU ARE REQUESTED TO VACATE THIS PROPERTY IMMEDIATELY.    PLEASE   TAKE   ALL   OF   YOUR POSSESSIONS WITH YOU.

ON **MONDAY**, **OCTOBER 26, 2020** AT **0630 HOURS** THE PROPERTY WILL BE CHECKED, ANY PERSON FOUND TRESPASSING MAY BE ARRESTED AND ANY ITEMS LEFT BEHIND WILL BE PICKED UP AND REMOVED FROM THE PROPERTY.

IF YOU NEED ANY FURTHER INFORMATION CONTACT THE HAYWARD POLICE DEPARTMENT AT:

NORTHERN DISTRICT OFFICE (510) 293-5004
1190 B ST. HAYWARD CA

SOUTHERN DISTRICT OFFICE (510) 293-5750
28200 RUUS RD. HAYWARD CA

# NO TRESPASSING